UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

  UNITED STATES OF AMERICA

    - against -

  RICARDO MARIAN FANCHINI,                    Cr. No. 07-736 (S-1) (CPS)

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -X


**GOVERNMENT'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT'S MOTION
FOR A DISCOVERY CUT-OFF AND
RELEASE OF THE DEFENDANT PENDING TRIAL**


BENTON J. CAMPBELL
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Steven L. Tiscione
Toni M. Mele
Licha M. Nyiendo
Alexander A. Solomon
Assistant U.S. Attorneys
        (Of Counsel)

## PRELIMINARY STATEMENT

In a motion filed on June 10, 2008, the defendant seeks an arbitrary discovery cut-off more than five and a half months before the scheduled trial date, proposes an unprecedented discovery format that would frustrate the government's efforts to continue to provide timely discovery in this unusually complex matter, and makes demands for discovery which the defendant is not entitled to under the law and which defense counsel knows full well are both unreasonable and physically impossible. Moreover, the defendant's motion is premised on a fundamental misunderstanding of the government's discovery production to date (which now includes all discoverable evidence within the government's possession, custody or control) and its intentions regarding the production of additional discovery as it becomes available.

In addition, the defendant, who is a convicted felon, has been a fugitive from the United States for twenty years, is charged with being the head of an international narcotics trafficking organization, faces life in prison if convicted at trial, is not a citizen or even a resident of the United States, is only present in the United States because he was extradited here to face the criminal charges in this case, has an Immigration Detainer lodged against him, has significant ties to multiple foreign countries (including several with no formal extradition treaties with the United States), and is charged with committing a serious drug trafficking offense while on "temporary release" from the sentence imposed on his previous felony conviction, asks the Court to "temporarily release" him to the custody of his attorneys pending trial in this matter, under the supervision of private security guards paid for by the defendant.

For all of the reasons set forth below, the defendant's motion should be denied in its entirety.

1

**STATEMENT OF FACTS**

A.    Procedural History of the Case

On September 28, 2007 a grand jury sitting in this district returned a three-count indictment against RICARDO MARIAN FANCHINI (07 CR 736 (CPS)), charging him with: (i) conspiring to import cocaine, heroin and MDMA into the United States; (ii) conspiring to distribute cocaine, heroin and MDMA, knowing that such substances would be imported into the United States; and (iii) conspiring to launder the proceeds of specified unlawful activity, all in violation of Title 21, U.S.C., §§ 959(c), 960(a)(1), 960(a)(3), 960(b)(1)(A), 960(b)(1)(B)(ii), 960(b)(3) and 963; and Title 18, U.S.C., § 1956(h).  This indictment and accompanying arrest warrant were ordered sealed by the Honorable Roanne L. Mann on September 28, 2007.

On October 3, 2007, the defendant RICARDO FANCHINI was arrested in the United Kingdom pursuant to a Provisional Arrest Request by the United States Attorney's Office for the Eastern District of New York.  The defendant was subsequently extradited to the United States.

On January 11, 2008, a grand jury in this district returned a superseding indictment against the defendant RICARDO FANCHINI (07 CR 736(S-1)(CPS)), charging him with: (i) engaging in a continuing criminal enterprise; (ii) conspiring to import cocaine, heroin and MDMA into the United States; (iii) conspiring to distribute cocaine, heroin and MDMA, knowing that such substances would be imported into the United States; (iv) conspiring to distribute and possess with intent to distribute cocaine, heroin and MDMA; (v) importing five or more kilograms of cocaine into the United States; (vi) distributing cocaine knowing that such substance would be imported into the United States; (vii) attempting to possess with intent to

distribute five or more kilograms of cocaine; and (viii) conspiring to launder the proceeds of specified unlawful activity.

Upon his extradition to the United States, the defendant RICARDO MARIAN FANCHINI appeared in the Eastern District of New York on February 1, 2008, and was arraigned on the superseding indictment by the Honorable Viktor Pohorelsky.

At the initial status conference on February 11, 2008, your Honor issued a pretrial scheduling order setting a date for jury selection and trial on January 12, 2009.  The scheduling order required pretrial motions to be made returnable on or before June 23, 2008.  By motion dated May 12, 2008, the defendant requested an extension of time to file pretrial motions, with the consent of the government, and your Honor issued a revised scheduling order requiring all pretrial motions to be made returnable by September 15, 2008.

B.    Discovery That Has Been Produced to Date

As detailed in the discovery letters attached to this memorandum of law, the government has made extraordinary efforts to produce discovery in a timely fashion in this unusually complex case.  The government has produced voluminous discovery on a rolling basis since the defendant's initial appearance in this matter, and has endeavored to turn over materials to the defendant as soon as the government obtained custody or control over the evidence.  To date, the government has made five separate discovery productions, which constitute the entirety of discoverable evidence in the possession, custody or control of the government:

a.    On February 1, 2008, the date of the defendant's initial appearance before Judge Pohorelsky, the government produced seven compact disks containing audio recordings and draft translated line sheets for wire communications intercepted over five telephones pursuant to Title III. (See Exhibit 1)

b.    On March 19, 2008, the government produced over 6,000 pages of bank records;

3

multiple boxes of materials seized from the execution of search warrants in three different districts (EDNY, SDNY & DNJ); and audio recordings and line sheets from two additional Title III wiretaps. (See Exhibit 2)

c.     On April 24, 2008, the government produced over 30 boxes of documents from the execution of searches both in the United States and the United Kingdom; 10 compact discs containing consensually monitored recordings; several boxes of documents and multiple discs containing audio recordings which were received from an MLAT to the Netherlands; and all audio recordings, affidavits, orders, and related court documents from twelve U.S. wiretaps and multiple search warrants. (See Exhibit 3)

d.     On May 8, 2008, the government produced a search warrant affidavit for items seized from the London residence of the defendant; six compact disks containing consensually monitored recordings of calls/ meetings between an undercover agent and Harry Peralta, a co-conspirator of the defendant; English transcripts of the afore-mentioned calls/ meetings; chain of custody forms and photographs of audio tapes; photographic evidence obtained during an investigation into the defendant by the Federal Bureau of Investigation; the defendant's address book with telephone numbers; and microfiche, brochures, audio recordings, transcripts, photographs, and other evidence relating to the 1998 prosecution of a co-conspirator in the Southern District of Florida. (See Exhibit 4)

e.     On June 13, 2008, the government produced passports, customs declarations, travel documents, passenger lists, travel itineraries, receipts, checkbooks, money transfer slips, credit card statements, surveillance photographs, business cards, identification documents, transcripts of consensually monitored meetings, telephone records, photographic negatives, packaging materials, approximately 245 audio cassette tapes from court-authorized wiretaps of telephones utilized by co-conspirators during approximately 1990 and 1991, and other evidence relating to the prosecution of co-conspirators in the Eastern and Southern Districts of New York; several boxes of documents containing evidence received from Belgium pursuant to MLAT request, including the investigative case file from Fanchini's conviction for money laundering; and an English translation linesheet of two court-authorized wiretaps in Uruguay involving the defendant. (See Exhibit 5)

C.     Foreign Evidence Not Yet In the Possession,
       Custody or Control of the Government

       As outlined above, the government has produced all material to which the

defendant is entitled under Rule 16 of the Federal Rules of Criminal Procedure.  In several

instances, the government has even turned over evidence that is not strictly discoverable under

Rule 16.  For example, although the defendant would not be entitled to such evidence until shortly before trial pursuant to 18 U.S.C. § 3500, the government has elected to produce law enforcement reports and witness statements received through Mutual Legal Assistance Treaty ("MLAT") requests to the Netherlands and Belgium, in recognition of the difficulties and delays inherent to the production of such sizeable amounts of foreign-language materials.  As a convenience to the defendant and his attorneys, the government has produced, and will continue to produce, the entire universe of materials it receives from foreign governments pursuant to MLAT requests, regardless of whether the defendant would be entitled to such evidence under law.

To date, the government has filed more than a dozen MLAT or letters rogatory requests seeking evidence from foreign jurisdictions.  The government has diligently turned over all evidence it has thus far received pursuant to these requests,[1] and will continue to do so.  To the extent that the government has not yet received requested foreign evidence, the government is obviously not in a position to turn over such evidence to the defendant.  Moreover, complex issues of international law, the scope of treaties between the United States and foreign governments, and the nature of diplomatic relations between sovereign nations renders such evidence beyond the government's sphere of influence to an extent not normally experienced in a typical criminal prosecution.

The United States Office of International Affairs, which is responsible for coordinating all foreign requests for evidence, has advised the government that MLAT requests

---

[1]  Specifically, the government has received evidence from the United Kingdom, Belgium and the Netherlands, all of which has been produced to the defendant.

5

typically take many months to complete, and in some countries, can take as long as a year before evidence is turned over to U.S. officials.  Given the nature and procedural posture of this case, all of the government's MLAT requests were filed with the utmost expedition and have largely been given priority designation by the receiving countries.  Nevertheless, it is impossible for the government to control exactly when evidence will be turned over to the U.S. by foreign governments.

In an effort to hasten the time-consuming MLAT process, the government is making arrangements to travel to several foreign countries for the purpose of collecting and taking possession of requested evidence.  Contrary to defense counsel's suggestion, the government has every intention of bringing all of the requested evidence back to the United States and will make the entire universe of collected evidence available to the defendant as it has done in the past (and without regard to the limitations of Rule 16).

Moreover, the government has contracted with private parties to translate any discoverable evidence it receives in a language other than English.  Although not strictly required to do so by Rule 16, the government has voluntarily offered to provide these translations to the defendant at no cost.[2]  Due to the volume of translated material, coupled with the multitude of distinct languages reflected in the evidence collected to date, the translation of discoverable evidence in the government's possession is expected to take several months and

_____

[2] As with all of the discovery produced in this case, the government will make the materials available at an independent copy center, which will furnish a copy of the evidence to the defendant.  While the defendant will be required to pay the duplication costs, the costs of translating the evidence (which grossly outweighs the cost of simple copying) will be fully paid by the government.

cost hundreds of thousands of dollars.[3]

   With respect to foreign evidence not yet received by the United States, the government is not in a position to even begin to estimate how long such evidence will take to translate, as the government is unaware of the exact volume of evidence extant, or the type and number of different languages contained in the original documents and audio recordings.  Based on estimates the government has received for the foreign materials it has already sent for translation, even a relatively moderate volume of material (such as 1,000 pages of documents in a single language) can take upwards of two to three months to translate depending upon the language involved.

   As it has done in the past, the government will continue to make English translations available to the defendant as soon as they become available to the government.

D.  The Defendant's Background

   The defendant RICARDO MARIAN FANCHINI is a dual citizen of Poland and Germany.  The defendant is not a citizen, nor even a permanent resident of the United States, and has no ties to the community.  The defendant has been a fugitive from two bench warrants issued in New Jersey State Court since approximately 1987, when the defendant fled the United States after being arrested for burglary.  As documented by judicially-authorized intercepted telephone conversations, evidence seized from the execution of search warrants both in the United States and Europe, travel records, and a review of the defendant's passport, which was seized at the time of the defendant's arrest in the United Kingdom, the defendant has made frequent

---

[3] Evidence previously received by the United States has already been sent out for translation and will be ready for production at an earlier date.  Any English-language translations received by the government have been produced to the defendant.

7

international trips to a variety of different foreign nations and maintains significant ties to several countries (including the ownership of multi-million dollar residences and commercial properties in the United Kingdom, Russia, France and the Ukraine).  At least two of these countries have historically proven to be unwilling or unable to locate, arrest and extradite fugitives to the United States for criminal prosecution.  The defendant was extradited to this district from the United Kingdom and was paroled into the United States for the limited purpose of facing the pending criminal charges.  At the time of his admission into the United States, an Immigration Detainer was lodged against him, mandating that the defendant be transferred immediately to the custody of Immigration and Customs Enforcement upon his release from federal custody.

The defendant is charged with being the head of an international criminal organization that has engaged in the large-scale trafficking of narcotics and other contraband. He faces a mandatory minimum sentence of twenty years and a Guidelines sentence of life if convicted of the top count in the indictment.  In addition, the defendant is charged with laundering tens of millions of dollars in illegal proceeds throughout the world.  Accordingly, the defendant is an obvious flight risk if released from pretrial detention, as he possesses both a strong incentive and the financial means to flee the jurisdiction and escape prosecution.

Further, the defendant's release from pretrial detention, in any capacity, would constitute a danger to the community.  Pursuant to 18 U.S.C. §§ 3142(e) and (f)(1), the crimes with which the defendant is charged create a presumption of dangerousness such that no condition or combination of conditions will reasonably assure the safety of the community.

More specifically relevant to the defendant's request for "temporary release" to

the custody of his attorneys, one of the charged crimes in this case alleges that the defendant

engaged in a serious narcotics trafficking offense after obtaining a two-day "temporary release"

pass from the Belgian prison where he was serving a four-year sentence for a money laundering

conviction.  Photographic evidence, surveillance by law enforcement officers and conversations

intercepted over a "bug" secreted within the car of a co-conspirator, together with other evidence

discovered in the course of a Dutch criminal investigation, revealed that the defendant secured a

two-day furlough from his Belgian prison so that he could mediate a dispute between members

of his narcotics trafficking organization and a source of supply for MDMA regarding a pending

narcotics deal.  The Dutch investigation resulted in the seizure of more than 1 million MDMA

units hidden aboard a boat in the Netherlands within days of the meeting between the defendant

and his co-conspirators.

## DISCUSSION

I.    DEFENDANT'S MOTION FOR AN ARBITRARY DISCOVERY CUT-OFF DATE
      MORE THAN FIVE AND ONE HALF MONTHS BEFORE THE SCHEDULED
      TRIAL DATE IS UNREASONABLE AND HAS NO BASIS UNDER THE LAW

         Without citing to a single case in which such an unprecedented and legally

unsupportable measure was adopted, defendant seeks to impose an absolute cut-off deadline for

all government discovery of August 1, 2008, more than five and one half months before the

scheduled trial date in this matter.  In addition, the defendant demands that English language

translations of all such discovery be produced by the August deadline, despite acknowledging

(and failing to dispute) the government's representation that even moderate volumes of foreign

evidence will take at least two to three months to translate.

         In lieu of requesting more reasonable accommodations in this undeniably

9

complex prosecution spanning nearly two decades of the defendant's criminal activities as the head of an international narcotics trafficking organization, the defendant instead asks the Court to arbitrarily curtail the government's ability to obtain evidence and/or use evidence that has been assiduously produced to the defendant in its original form, and seeks to compel the government to produce evidence that is not in its possession, custody or control.[4]

Rule 16(a)(E) of the Federal Rules of Criminal Procedure provides, in relevant part:

> [U]pon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of these items, <u>if the item is within the government's possession, custody, or control</u> and ... the item is material to preparing the defense ... the government intends to use the item in its case-in-chief at trial...or [] the item was obtained from or belongs to the defendant.

(Emphasis added). The government has fully complied with its obligations under Rule 16 by producing to the defendant, or making available for his inspection, each and every piece of evidence in its possession, custody or control that the government intends to use in its case-in-

---

[4] Without purporting to be an exhaustive list, reasonable alternatives to the defendant's arbitrary discovery cut-off deadline might include: an extension of time within which to file pretrial motions; an opportunity to file additional pretrial motions if the defendant seeks to exclude evidence obtained by the government after the deadline for filing pretrial motions has expired; or an adjournment of the trial date if the defendant would prefer to make all pretrial motions in a single filing and needs more time to review the evidence. The government would consent to any one, or a combination of these alternatives. Moreover, since the complexity of this case is undeniable, both by the nature of the prosecution itself and the difficulties inherent to the discovery of considerable foreign evidence, a complex case designation would be particularly appropriate. <u>See</u> 18 U.S.C. § 3161(h)(8)(authorizing a continuance of the date on which a criminal trial will commence in cases that are "so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by [the Speedy Trial Act]").

chief at trial, is material to preparing the defense, or was obtained from or belongs to the defendant.

In several instances, particularly with respect to foreign evidence, the government has accommodated informal requests by the defendant to produce evidence that is not mandated by Rule 16.  For example, at defense counsel's request, the government has made available to the defendant all of the evidence it has obtained from foreign sources through the use of MLAT requests, even if some of the materials contained therein were not discoverable pursuant to Rule 16 (such as investigative reports by foreign law enforcement officers).  Despite the defendant's protestations to the contrary, the government has also communicated to defense counsel that it will continue to produce all evidence received from foreign sources without regard to whether the defendant is entitled to the totality of such evidence under Rule 16.

To the extent that the defendant seeks an order compelling the government to produce all evidence by the arbitrary deadline of August 1, 2008, including any materials in the custody of foreign governments, such an order is contrary to the plain language of Rule 16, which requires only that the government produce items "within the government's possession, custody, or control."  Fed. R. Crim. P. 16(a)(E).

It is axiomatic that evidence in the custody of foreign entities, over which the United States government has no legal or practical authority or control, is not within the possession, custody or control of the government for purposes of Rule 16(a)(E).  See, e.g., United States v. Gatto, 763 F.2d 1040, 1046-49 (9th Cir. 1985) (holding that evidence found and held by state authorities until the eve of trial became discoverable only when the state authorities placed it in the hands of the federal authorities, because "the triggering requirement under rule

16 is that the papers, documents, and tangible objects be in the actual possession, custody or control of the government"); United States v. Friedman, 593 F.2d 109, 119-20 (9th Cir. 1979) (holding that neither Rule 16 nor the Jencks Act required the production of a document held by a foreign government, because it was not in the possession, custody or control of the federal prosecutor); United States v. Flores, 540 F.2d 432, 437 (9th Cir. 1976) (documents in possession of Mexican government not discoverable pursuant to Rule 16 because they were not in the possession, custody, or control of the government); United States v. Cotroni, 527 F.2d 708, 712 (2d Cir. 1975) (holding that the government prosecutors could not be charged with wrongdoing for failure to permit inspection of wiretap recordings which were still in the possession of Canadian police because such items were "not within the possession, custody or control of government" for purposes of Rule 16).[5]

Accordingly, since Rule 16 obligates the government to disclose only those foreign documents which have physically been delivered into the government's possession, the defendant's petition for an order directing the government to produce all discovery, including evidence still in the control of foreign governments, must be denied.

_____

[5] See also United States v. Paternina-Vergara, 749 F.2d 993 (2d Cir. 1984). In Paternina-Vergara, the Second Circuit was faced with an analogous question in the context of a motion under the Jencks Act, which similarly requires the production of materials "in the possession of the United States," 18 U.S.C. § 3500. In deciding whether documents in the physical possession of Canadian authorities were constructively in the possession of the United States because of close cooperation between the U.S. Drug Enforcement Administration and Canadian authorities, the Court held that "even in the course of a joint investigation undertaken by United States and foreign law enforcement officials the most the Jencks Act requires of United States officials is a good-faith effort to obtain the statements of prosecution witnesses in the possession of the foreign government" and any items withheld at the discretion of the foreign government were not in the possession of the United States. Paternina-Vergara, 749 F.2d at 997-98.

Similarly, the defendant's motion to compel the government to produce English translations of all discoverable material by an arbitrary deadline more than five and one half months prior to the scheduled trial date in this case finds no support in Rule 16 or any other provision of law. Rule 16(a)(E) requires only that the government "permit the defendant to inspect and copy or photograph" discoverable evidence; nothing in the plain text of the Rule requires that the government translate the materials as long as they are made available for the defendant's inspection and/or copying. Nevertheless, although not legally required to do so, the government has expressly represented to defense counsel that it intends to provide English translations of all Rule 16 materials (at the government's considerable expense). Indeed, the government has produced an appreciable volume of translated material to date, and will continue to produce such translations as they become available to the government.

In any event, as discussed above, the government can only be expected to produce evidence in its possession, custody or control. There has been no suggestion, nor could there be, that the government is withholding translated materials from the defendant. In every instance since the inception of this case, the government has endeavored to provide translations of any Rule 16 material to the defendant as soon as practicable. The defendant's chimerical demand for nearly instantaneous translations of hundreds of thousands of documents in multiple languages, a significant portion of which remain in the custody of foreign governments from which the United States has no practical or legal ability to compel production, is not only unreasonable, but quite literally, impossible. Based upon estimates the government has received from a number of different contract translators, which the defendant does not appear to dispute, even a moderate volume of foreign documents (approximately 1,000 pages in a single language) can take up to

13

three months to translate.

Accordingly, the defendant's motion for an order requiring the government to produce translations of all discoverable materials by August 1, 2008 must be denied.

II.    DEFENDANT'S MOTION FOR EQUAL ACCESS TO FOREIGN INVESTIGATIVE FILES IS UNNECESSARY, WOULD FRUSTRATE THE GOVERNMENT'S EFFORTS TO EXPEDITE THE PRODUCTION OF FOREIGN EVIDENCE AND IS BASED ON A FUNDAMENTAL MISUNDERSTANDING OF THE GOVERNMENT'S INTENTIONS WITH RESPECT TO THE COLLECTION AND DISCLOSURE OF EVIDENCE IN THE CUSTODY OF FOREIGN GOVERNMENTS

Seemingly without regard for the method by which the government has produced all foreign discovery to date, and in direct contrast to the government's intentions with respect to the collection and disclosure of evidence currently in the custody of foreign governments, which was clearly expressed to defense counsel during the Rule 16.1 discovery conference, the defendant brazenly accuses the government of refusing "to make a full set of foreign source materials available to the defense for inspection and review" and "acting to put evidence out of reach of the defense by keeping foreign source files outside the United States without making a 'good faith' determination of what materials may be discoverable." (Def. Mem. at 14).

Based on this erroneous premise, the defendant seeks an order permitting defense counsel to interject themselves into the government's collection of evidence by interviewing foreign officials and inspecting foreign evidence files while the government is simultaneously attempting to secure the transfer of such evidence to the United States by navigating an often challengingly precise set of procedural channels prescribed in international mutual assistance treaties.  Such interference will only serve to frustrate the government's ability to expedite the collection and timely disclosure of foreign evidence, as all interactions between prosecutors in

14

the United States and officials of foreign nations are strictly controlled through the U.S. Office of International Affairs and the equivalent Central Authority in the foreign country. As such, all interactions, including, but not limited to, the inspection and/or transfer of evidence, interviews of foreign witnesses (including law enforcement officers) and even meetings between U.S. prosecutors and foreign officials must be carefully orchestrated and planned well in advance. Any revisions or modifications to such plans are difficult and time-consuming to arrange, as the revised plans must be approved by both the Office of International Affairs and the Central Authority of the foreign government. Thus, any order requiring defense counsel from the United States (or even local counsel) to be present during the inspection and collection of evidence by the United States is likely to disrupt the government's plans for obtaining such evidence in a timely fashion and cause further delays in the defendant's receipt of discovery.

Not surprisingly, the defendant is yet again unable to cite even a single legal authority supporting his request for extraordinary discovery measures outside the scope of the Rules of Criminal Procedure. Indeed, it is questionable whether this Court would even have the authority to compel foreign government officials, who are not subject to the jurisdiction of this court and who have not been designated as government witnesses at trial, to subject themselves to questioning by defense counsel or to make available for review by defense counsel the investigative files of a foreign law enforcement agency.

In any event, the defendant's motion is rendered moot by the simple fact that the government has already complied with defense counsel's request to "make a full set of foreign source materials available to the defense for inspection and review." (Def. Mem. at 14). As discussed at length above, and as demonstrated by the attached discovery letters and the

15

materials produced to the defendant thus far, the government has always maintained that it would make available to the defendant a complete set of any documents the government receives pursuant to MLAT requests from foreign jurisdictions (notwithstanding the fact that the defendant would not be entitled to all of those materials pursuant to Rule 16). The government has made this representation on numerous occasions and has demonstrably honored such representation by producing all foreign evidence it has received to date. Far from "absolv[ing] itself of its responsibility" under Rule 16 (Def. Mem. at 12), and "deliberately seek[ing] production of only excerpts of investigative files" in some insidious plot to deprive the defendant of his rights under the law (Def. Mem. at 14), the government is fully aware of its obligation under Rule 16, Brady and the Jencks Act, and will scrupulously comply with those obligations.

III.    THE DEFENDANT'S MOTION FOR TEMPORARY RELEASE IS WITHOUT MERIT AS THE DEFENDANT HAS NOT ESTABLISHED THAT HIS RELEASE IS NECESSARY FOR PREPARATION OF HIS DEFENSE MORE THAN 200 DAYS PRIOR TO THE SCHEDULED TRIAL DATE IN THIS MATTER AND WITHOUT ANY ATTEMPT TO SEEK A MORE REASONABLE JUDICIAL REMEDY

The defendant, who is not a citizen of the United States and was paroled into the country by virtue of his extradition and for the sole purpose of facing pending criminal charges, seeks to be temporarily released to the custody of his attorneys under the purported supervision of private security guards paid for by the defendant. Specifically, the defendant requests that the Court exercise its power under 18 U.S.C. § 3142(i) and modify the order of detention lodged against him to allow the defendant to make "periodic daytime visits to defense counsel's offices under the custody of a private security agency and to be returned each evening to the custody of the MDC." (Def. Mem. at 16).

Title 18, United States Code Section 3142(i) provides that "the judicial officer

16

may, by subsequent order, permit the temporary release of the person, in the custody of a United States Marshal or another appropriate person, to the extent that the judicial officer determines such release to be <u>necessary</u> for preparation of the person's defense or for another compelling reason." (emphasis added). As defense counsel concedes, § 3142(i) has been "infrequently applied." (Def. Mem. at 23). This is with good reason, as by its very nature, § 3142(i) would permit the release of a defendant where a judicial officer has already concluded that the defendant poses a risk of flight and/or danger to the community so great that no condition or combination of conditions will reasonably assure his appearance and the safety of the community. Indeed, this provision has so rarely been employed that the government was unable to find even a single instance in any reported federal case where this statutory provision was used to grant a defendant temporary release under circumstances even remotely similar to those faced by the defendant.

In the context of similarly complex prosecutions involving defendants with equally or more restrictive conditions than those at issue in this case, district courts have routinely denied motions for temporary release under § 3142(i). For example, in <u>United States v. Persico</u>, No. S 84 Cr. 809 (JFK), 1986 WL 3793, *1-2 (S.D.N.Y. Mar. 27, 1986), a complex case involving a 51-count RICO indictment against fourteen members of the Colombo Family of La Cosa Nostra, the district court denied a motion by lead defendant Carmine Persico for temporary release under § 3142(i). As in the instant case, the defendant in Persico sought temporary release to the office of his attorney or other suitable premises "under strict supervision," and argued that such release was necessary to so that he could "obtain greater access to a telephone, meet more readily with his co-defendants and their attorneys, conduct in person interviews of alleged co-

conspirators and witnesses necessary to the preparation of his defense, and review documents and files relevant to his defense." Id. at *1.  In rejecting defendant's proposal, the district court noted that the defendant, who had been incarcerated in the Metropolitan Correctional Center since his arrest, had more than a year since his indictment to adequately prepare for trial, during which time the defendant had "been permitted to meet with his defense counsel and co-defendants for consultation, review of documents and investigation of the charges against him," the defendant had "access to a telephone on a regular basis," and the Court had been "quite liberal in ordering that special measures be taken to facilitate [the defendant's] defense preparations, such as allowing videotape playing equipment to be brought into the M.C.C." Id. at *2.  Accordingly, the court concluded that temporary release was not "necessary" for the defendant to assist in the preparation of his defense in light of the defendant's "ample time and opportunity to participate in the preparation of his defense."  Id.; see also United States v. Birbragher, 2008 WL 2246913, *1 (N.D. Iowa May 29, 2008) (holding in an "extremely complicated and document-intensive case" that temporary release was not necessary for the defendant to prepare his defense despite: (i) the fact that the government prosecutors would "not permit his attorneys to remove or photocopy some of the documents from its open discovery file," and (ii) the fact that the bulk of the evidence was contained on compact discs and the correctional facility would only permit defense counsel to bring the compact discs and a computer for a few hours each day to meet with the defendant and review evidence).

    The defendant's failure to cite a single case in its entire memorandum of law in which a district court granted relief analogous to the defendant's extraordinary request is particularly telling.  Instead, defendant dedicates a sizable majority of his motion to a

18

referendum on the propriety of pretrial detention as a whole, an issue that is largely irrelevant in light of the continued applicability of the Bail Reform Act, which expressly provides for pretrial detention where, as here, no condition or combination of conditions will reasonably assure the defendant's appearance and the safety of the community.  The defendant also devotes considerable effort to articulating the unchallenged maxim that pretrial detention must be grounded upon governmental interests beyond the simple penological interests of just punishment and rehabilitation.  This issue is likewise irrelevant, as the reasons for the defendant's pretrial detention in this case (assurance that the defendant will not flee from prosecution and protection of the community) undoubtedly qualify as legitimate, non-penological governmental interests.  Finally, the defendant claims that pretrial confinement infringes upon his right to counsel under the Sixth Amendment but makes no allegation that the defendant has been prevented from seeing or contacting counsel or otherwise restricted in his ability to communicate with his attorney except by virtue of the fact of confinement itself.  See, e.g., Campbell v. Magruder, 580 F.2d 521, 532 (D.C. Cir. 1978) (noting that conditions of confinement are constitutionally suspect if they impede a defendant's preparation of his defense "apart, of course, from the fact of confinement itself").

Sifting through the multitude of generally-accepted legal platitudes and factually irrelevant issues that form the bulk of defendant's motion, reveals that the defendant's sole basis for requesting this extraordinary and potentially infeasible relief is that the MDC has not provided the defendant with a secure facility within which to store the entirety of government discovery produced in this case and has limited his computer access in the law library to only a few hours per week.  At this stage in the proceeding, more than 207 days before the scheduled

trial date, the defendant's release from pretrial detention is hardly <u>necessary</u> to remedy these purported infringements on the defendant's ability to assist in his defense.  The defendant has secured the representation of an exceptionally experienced and proficient defense counsel who has full access to all of the government's discoverable evidence in the case, has at least two able co-counsel that have been assisting in the preparation of the defendant's case and has the same access to the defendant as any counsel representing an incarcerated defendant.  Moreover, the defendant has ample financial means to hire experts to aid in his defense, translators to facilitate the review of foreign-language evidence and private investigators to collect evidence and interview witnesses that could be presented at trial.  Even with the admittedly voluminous amount of evidence produced in discovery, the defendant is still in a far better position than the typical pretrial detainee.

        Indeed, in contrast to other incarcerated defendants, such as, for example, a defendant who elected to represent himself at trial, a defendant in solitary confinement or lockdown, or a non-English speaking defendant with no ability to review discovery without the aid of an interpreter, the defendant's conditions of confinement are scarcely dire and can easily be remedied without resorting to the extraordinary relief sought by the defendant.  <u>See</u>, <u>e.g.</u>, <u>Birbragher</u>, 2008 WL 2246913 at *1 (permitting defense counsel to bring a laptop computer into the correctional facility to review evidence with the defendant that was contained on compact discs); <u>Barham v. Powell</u>, 895 F.2d 19, 22-24 (1st Cir. 1990) (finding accommodations made to permit pro se defendant to prepare for trial while in prison constitutionally sufficient despite the defendant's ability to access the law library for only five weeks prior to trial); <u>Persico</u>, 1986 WL 3793 at *1-2 (ordering that "special measures be taken to facilitate [the defendant's] defense

preparations, such as allowing videotape playing equipment to be brought into the M.C.C.").

Defendant's alleged difficulties may be ameliorated in a number of simple ways. For example,

an order from the Court permitting defense counsel to bring a laptop computer into the MDC

would allow the defendant to review all of the audio recordings produced by the government.

Moreover, the defendant could have any paper documents he wishes to review scanned into

computer files and for similar review by computer. Alternatively, the court could order the

MDC to make available to the defendant a secure location within which he could store a

reasonable amount of discovery documents. There is no practical reason why the defendant

would need constant access to the entire universe of discovery in this case at once, as he could

hardly review the hundreds of thousands of documents in one sitting and defense counsel could

easily rotate the documents to which the defendant has access on a daily basis. Either of these

reasonable accommodations, or both, could alleviate any prejudice to the defendant as a result of

his pretrial incarceration.

       Given that the defendant's purported constitutional deficiencies can be remedied

without resorting to the extraordinary relief of releasing a non-bailable defendant to the custody

of private security guards bought and paid for by the defendant, it cannot seriously be argued

that temporary release is <u>necessary</u> for the defendant's participation in his own defense. In any

event, putting aside whether the defendant's proposal is even logistically possible for the MDC

to accommodate, and whether private security guards paid for by the defendant are truly the

"appropriate person[s]" contemplated by § 3142(i), the government strongly opposes the

defendant's release in any capacity. As discussed above, the defendant poses a considerable risk

of flight and danger to the community. Moreover, the defendant cannot be released from the

custody of the U.S. Marshals Service, even temporarily, as an Immigration Detainer was lodged against the defendant upon his parole into the United States.  Thus, if the defendant were released from the MDC, he would immediately be taken into custody by Immigration and Customs Enforcement officers and placed in removal proceedings.

For all of the foregoing reasons, the defendant's motion for temporary release must be denied.

## CONCLUSION

For all of the reasons set forth above, the Court should deny the defendant's motion in its entirety.

Respectfully Submitted,

BENTON J. CAMPBELL
United States Attorney
Eastern District of New York


By:_____/s/_____
STEVEN L. TISCIONE
TONI M. MELE
LICHA M. NYIENDO
ALEXANDER A. SOLOMON
Assistant United States Attorneys
(718) 254-6317/6138/6350/6074