UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

| | |
|---|---|
| UNITED STATES OF AMERICA | Cr. No. 07-736 (S-2) (CPS) |
| - against - | **SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR A DISCOVERY CUT-OFF AND TEMPORARY RELEASE** |
| RICARDO MARIAN FANCHINI, | |
| Defendant. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

The government respectfully submits this supplemental memorandum of law to apprise the court of additional facts that have arisen since the government filed its initial memorandum of law, and in response to legal arguments raised for the first time in the defendant's reply memorandum of law in support of discovery and temporary release motions filed on June 25, 2008.

Since filing its initial memorandum of law, the government has made the following additional discovery productions to the defendant:

a. On June 20, 2008, the government produced additional documents recently obtained from Belgium, mostly in Flemish, relating to the defendant's prior Belgian criminal conviction for money laundering; a compact disk containing English translations of documents received from the Netherlands and previously produced in their original language; and five compact disks from a 1997-1999 FBI investigation into the defendant and a co-conspirator, Peralta containing video recordings of meetings between an undercover agent and the co-conspirator, video recordings of the Kremly Princess yacht, and a video recording of the defendant's wedding to his previous wife. (See Exhibit 1).

b. On June 23, 2008, the government produced copies of Medicaid applications and recertifications sworn to by co-defendants Arthur Dozortsev and Nikolai Dozortsev, and several un-indicted co-conspirators, as well as bank records for these individuals demonstrating that the income and assets attested to by each of the above individuals was false. (See Exhibit 2)

1

On June 26, 2008, the government received a signed letter from legal counsel to the Metropolitan Detention Center ("MDC"), responding to the defendant's motion for temporary release. (See Exhibit 3). As set forth in the attached letter, the MDC is fully prepared to make reasonable accommodations to alleviate the conditions of confinement that the defendant claims are depriving him of his ability to meaningfully prepare for trial. In fact, the MDC has already communicated to defense counsel that it is in the process of complying with the defendant's requested accommodations, which have been delayed, in part, by the MDC's compliance with the defendant's previous request for special visitation privileges.

## DISCUSSION

I   DEFENDANT'S DEMAND FOR AN ABSOLUTE DISCOVERY CUT-OFF FOR EVIDENCE THAT IS NOT IN THE GOVERNMENT'S POSSESSION CUSTODY OR CONTROL IS INCONSISTENT WITH THE RULES OF CRIMINAL PROCEDURE AND IS NOT DESIGNED TO ASSURE THE PROPER AND ORDERLY ADMINISTRATION OF CRIMINAL JUSTICE

While acknowledging that "Rule 16 does not expressly authorize a district court to set a discovery deadline" (Def. Reply at 6), the defendant nonetheless asks the Court to exercise its discretionary authority under Rules 2 and 16 to impose an absolute cut-off precluding the government from obtaining additional evidence or using evidence that it has already provided to the defendant because such evidence is still in the process of being translated into English. This demand is inconsistent with the Rules of Criminal Procedure and is designed not to foster the proper and orderly administration of criminal justice, but to unfairly hamstring the government's ability to prosecute a case that the defendant concedes is unusually complex.

The Supreme Court has recognized that "federal courts 'may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress.' . . .

Whatever the scope of this 'inherent power,' however, <u>it does not include the power to develop rules that circumvent or conflict with the Federal Rules of Criminal Procedure</u>."  <u>Carlisle v. United States</u>, 517 U.S. 416, 426 (1996) (emphasis added) (internal citation omitted).  Rule 16(c) of the Federal Rules of Criminal Procedure provides:

> A party who discovers additional evidence or material before <u>or during trial</u> must promptly disclose its existence to the other party or the court if:
>    (1) the evidence or material is subject to discovery or inspection under this rule; and
>    (2) the other party previously requested, or the court ordered, its production.

Fed. R. Crim. P. 16(c). (Emphasis added).  Read in conjunction with Rule 16(a), which requires the disclosure of certain evidence if it is "within the government's possession, custody, or control," Rule 16(c) clearly contemplates a rolling discovery obligation that is inconsistent with the type of absolute cut-off proposed by the defendant.  Indeed, the plain language of the Rule makes clear that Congress anticipated situations where evidence would be discovered or come into the government's possession on the eve of trial, or even during the trial.  Such a rule would be unnecessary if the Rules of Criminal Procedure authorized the imposition of a pretrial cut-off of all discovery, such as provided for in the Federal Rules of Civil Procedure.  <u>See</u> Fed. R. Civ. P. 16(b) (requiring district court to enter scheduling order setting deadline for completion of discovery).  In addition, the defendant's proposed order, which would act to exclude any evidence the government obtained after the arbitrary discovery deadline, even if it is promptly disclosed to the defendant as soon as it comes into the government's possession custody or control, is directly contrary to Rule 16, which provides express remedies for violations of discovery obligations.  It is axiomatic that if the government has not violated any of its discovery

obligations under Rule 16 (which it clearly would not as long as the government turns over newly acquired evidence when it becomes available to the government), then the district court cannot use its "inherent authority" to impose the discovery sanctions that Rule 16 explicitly governs.  See United States v. Gatto, 763 F.2d 1040, 1046 (9th Cir. 1985) (holding that district court lacked the authority under Rule 16 and its inherent supervisory powers to manage discovery to exclude evidence that the government did not become aware of until four weeks before trial and diligently turned over to the defendant once it came into the government's possession).

   The defendant cites a number of cases for the general proposition that a district court has broad discretion to manage discovery "to assure the proper and orderly administration of criminal justice." United States v. Jackson, 508 F.2d 1001, 1007 (7th Cir. 1975).  Not a single one of these cases, however, involves the imposition of a court order requiring the government to produce materials outside its custody or control, in a manner that is inconsistent with Federal Rule of Criminal Procedure 16(c).  For example, the defendant places considerable emphasis on two out-of-Circuit cases: United States v. Grace, 526 F.3d 499 (9th Cir. 2008) and United States v. Zavala, 839 F.2d 523 (9th Cir. 1988).  Both cases are inapposite.

   In United States v. Zavala, the Ninth Circuit held that in a complex case involving over 11,000 Spanish-language telephone conversations, the government complied with its discovery obligations by producing to the defendant all 11,000 calls in the original language, and providing the defendant with translations of 1,800 calls which the government determined were relevant to the drug trafficking charges at issue.  Zavala, 839 F.2d at 527-28.  The Zavala Court specifically held that the government was not required to produce English-language translations

of all 11,000 calls because the defendant had access to an interpreter who could sit down with defense counsel and identify the subject matter of any calls that were not translated, and the district court offered to have any additional calls identified by defense counsel neutrally transcribed and translated. Id. at 528. The government has repeatedly represented both to defense counsel and the Court that it fully intends to provide English-language translations of all relevant foreign-language documents and audio recordings in its possession (and has already produced a considerable amount of such translated materials). Moreover, as in Zavala, the government has produced copies of all of the original foreign-language materials in its possession and will continue to do so.[1] Nothing in Zavala provides support for the defendant's blanket demand of English-language translations of all materials (including materials still in the custody of foreign governments) almost six months before trial. See also United States v. Flecha-Maldonado, 373 F.3d 170, 178 (1st Cir. 2004) (holding that district court's refusal to declare a mistrial or grant a continuance due to prosecution's delay in providing English

---

[1] Although the volume of foreign-language discovery in this case is considerable, several circumstances demonstrate that the defendant in this case has access to and a reasonable ability to review all of the materials produced similar to the defendant in Zavala. First, the defendant himself speaks multiple languages including, among others, Russian and Polish (languages that comprise a large majority of the foreign language discovery produced in this case), and can assist his attorneys in identifying and cataloguing evidence that is currently in the process of being translated into English by the government. Second, an appreciable amount of the discovery is comprised of evidence seized from the defendant's residence and safety deposit box in London, intercepted conversations to which the defendant was a party and other materials (such as contracts, loan agreements and other business documents) that the defendant has already reviewed prior to his arrest in this case or is obviously familiar with. Third, since the defendant has represented that he has the ability to pay private security guards (or U.S. Marshals) to provide daily supervision and transport to and from his attorneys' offices, the defendant unquestionably has the financial wherewithal to hire foreign language translators or other experts that can expedite and assist in his review of the evidence produced from foreign government sources.

transcripts to defense counsel of Spanish conversations on audio tapes until after the trial had commenced and just two days before transcripts were used at trial was not an abuse of discretion where defense counsel had access to Spanish tapes prior to trial, which he listened to with the assistance of a translator); United States v. Lopez, 147 F.3d 1 (1st Cir. 1998) (finding no deprivation of due process in federal narcotics prosecution where government furnished the defendant with English-translations of Spanish wire recordings only five days before trial).

As in Zavala, the government already has, and will continue to produce to the defendant, before trial, English-language translations of all evidence it intends to use at trial or is otherwise discoverable under the Rules of Criminal Procedure, Brady or 18 U.S.C. § 3500. Contrary to the defendant's claim, the government does not intend to "simply dump thousands of recorded conversations in several different languages" on the eve of trial (Def. Reply at 9).[2] Rather, the government has already contracted for the translation of all materials in its possession and will produce those translations to the defendant as soon as they become available to the government. For example, in its June 20, 2008 production, the government produced English translations of all evidence received from a Dutch MLAT. The government produced these translations to the defendant on the same day that it received the translations.

---

[2] Indeed, at this point in the proceedings, the defendant's motion is based solely on the hypothetical straw argument that envisions production of thousands of foreign language recordings and documents. In reality, the government may receive only limited volumes of material from the remainder of its outstanding MLAT requests, such as a relatively small number of intercepted telephone conversations involving the defendant and co-conspirators that the government expects to receive in short order. Thus, rather than the chimerical dumping of thousands of foreign-language documents and recordings on the eve of trial that defendant implies will be the inevitable result if the Court refuses to accede to his unreasonable demand for a discovery cut-off date of August 1, the more likely scenario is that the government will receive limited amounts of documentary and electronic evidence and will be in a position to disclose such evidence to the defendant months before trial.

The defendant's reliance on United States v. Grace is equally unavailing. In Grace, the Ninth Circuit upheld the district court's decision to order the government to produce a final witness list before trial, and then exclude witnesses that the government unilaterally attempted to call at trial even though they were not listed on the government's witness list. Grace, 526 F.3d 499, 508-09 (9th Cir. 2008). Unlike the absolute discovery deadline the defendant seeks to impose in this case, which is clearly inconsistent with Rule 16(c) of the Federal Rules of Criminal Procedure, the authority of a district court to require the pretrial production of a witness list and sanction violations of the order by excluding witnesses, is well supported in the case law. See, e.g., United States v. Napue, 834 F.2d 1311 (7th Cir. 1987) (district court has inherent power to require government to provide defendant with list of government witnesses, but court has no authority to order government to produce statements of witnesses prior to time that witnesses testify); United States v. Higgs, 713 F.2d 39, 44 n. 6 (3d Cir. 1983) (same). Despite two opportunities to do so, the defendant has still failed to cite even a single case where a district court imposed a discovery order requiring the government to produce evidence not in its possession custody or control, months before the scheduled trial date, or risk exclusion of relevant evidence at trial.[3]

Indeed, the Ninth Circuit itself distinguished the legal difference between a court's inherent authority to order the production of a witness list before trial (and punish violations) as opposed to the district court's inability to impose Rule 16 sanctions under its

---

[3] As evidenced by the Ninth Circuit's decision in Zavala, there is no legal support for the defendant's even more onerous demand that the government be precluded from using evidence at trial that has already been produced to the defendant simply because the government cannot meet the defendant's unreasonable and impossible time-table for translation of the evidence.

"inherent authority" where the government has not violated its Rule 16 obligations. See Grace, 526 F.3d at 515-16 (citing Gatto for the proposition that the district court may not use its inherent authority to impose a sanction prescribed by Rule 16 when the government has not violated its Rule 16 obligations). As the Court explained in Gatto:

> Regardless of whether the supervisory power stems from the federal courts' inherent power to check intrusions by other branches of government or whether it is a form of specialized federal common law, the separation-of-powers principle imposes significant limits on it. As a threshold matter, a court may not exercise any supervisory power absent "a clear basis in fact and law for doing so." United States v. Chanen, 549 F.2d 1306, 1313 (9th Cir.), cert. denied, 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83 (1977); see also United States v. McClintock, 748 F.2d 1278, 1283-86 (9th Cir. 1984). Proper regard for judicial integrity does not justify a " 'chancellor's foot' veto" over activities of coequal branches of government. United States v. Russell, 411 U.S. 423, 435, 93 S.Ct. 1637, 1644, 36 L.Ed.2d 366 (1973). Judicial integrity is rarely threatened significantly when executive action does not violate the Constitution, a federal statute, or a procedural rule. A federal court that imposes sanctions on executive conduct that is otherwise permitted by the Constitution, a federal statute or a rule will most likely be invading the executive sphere rather than protecting itself from invasion. Similarly, the separation-of-powers principle suggests that the creation of a rule by supervisory power can be justified only when a recognized right has been violated. Even then, it may be wise for the courts to await congressional action.
>
> The Supreme Court has also indicated that the supervisory power may not be used to impose remedies for the vindication of nonconstitutional rights that the Court deliberately has limited in the context of vindicating constitutional rights. See United States v. Payner, 447 U.S. 727, 735-36, 100 S.Ct. 2439, 2446, 65 L.Ed.2d 468 (1980). Thus, for example, courts may not impose an exclusionary rule in the name of exercising their supervisory power to remedy a nonconstitutional violation in seizing evidence to the extent the Supreme Court limits that remedy to fourth amendment violations. Id. at 736, 100 S.Ct. at 2446.
>
> The delay in disclosure in this case did not violate any constitutional provision, federal statute, specific discovery order,

8

> or any other recognized right except perhaps rule 16, Fed.R.Crim.P. See United States v. Roybal, 566 F.2d 1109, 1110-11 (9th Cir. 1977) (recognizing supervisory power to remedy prejudice of untimely disclosures of evidence in violation of specific discovery order by sanctions as severe as conviction reversals). Moreover, the fact that rule 16 contains specific remedies for its violation eliminates any justification for an exercise of supervisory power to create any other remedy for it. We hold, therefore, that the separation-of-powers principle barred the district court from exercising any supervisory power to exclude the evidence in this case.
>
> ****
>
> The defendants may have been put into a difficult position because the government announced, four weeks before trial, that it had 382 tangible items it planned to introduce into evidence [which had been, until that time, in the possession of state authorities and thus not in the possession, custody or control of the government pursuant to Rule 16]. Although the district court could not suppress the evidence pursuant to any supervisory powers or rule 16, and the parties have cited to us no other authority for such an order, the district judge could have considered more searchingly whether a continuance was appropriate under the circumstances simply as a matter of proper case management. The record is barren as to how much time longer than four weeks, if any, the defendants would have needed to prepare to meet this new evidence-indeed, the defendants did not even request a continuance. Thus, we cannot review whether a continuance would have been appropriate here.

Gatto, 763 F.2d at 1046. As the reasoning of Gatto makes clear, the court has no authority under Rule 16, or its "supervisory powers" to preemptively exclude evidence where there has been no Rule 16 violation, which is precisely what the defendant asks the Court to do. Moreover, as Gatto makes clear, the appropriate remedy would be an adjournment of trial rather than preclusion of evidence.

In any event, Grace is factually distinguishable from the case at bar. As an initial matter, the government consented to the district court's order requiring the production of a finalized witness list prior to trial and then unilaterally invoked its ability to violate the order by

9

purporting to "reserve its right to update its witness list and exhibit list through the close of all evidence at trial" by providing for such discretion in its disclosed witness list. United States v. Grace, 526 F.3d at 509. Moreover, the Court sought to impose a deadline for the production of a final witness list because the government initially told the Court that it was prepared to try the case in September and expected to call 60 to 80 witnesses. By the time it disclosed its initial witness list on September 30, the government had expanded the list to include 233 witnesses and counting. At subsequent status conferences the government continued to inform the Court that it intended to add more witnesses to what the district court characterized as an "already unwieldy list." Id. at 514.

This is not a situation where the government has failed to comply with its discovery obligations, withheld material evidence or otherwise abused the discovery process. Indeed, in the four and one half months since the defendant's initial appearance in this case, the government has made seven discovery productions amounting to over forty boxes of documents; hundreds of hours of audio and video recordings; and English-language translations of foreign discovery, intercepted conversations, and consensually-monitored calls and meetings. The government has diligently produced all of the materials in its possession and has continually made disclosures of new evidence immediately upon its receipt by the government. The government's inability to comply with the defendant's demand for instantaneous translations of foreign evidence that is not yet in the government's possession is not a "dilemma . . . of its own making." (Def. Reply at 2).[4] The government has made tremendous efforts to obtain and

---

[4] In yet another example of the unreasonableness of the defendant's discovery requests, defense counsel have made repeated demands for the immediate production of foreign materials and then castigate the government for not spending "hundreds of hours" meticulously indexing

10

produce evidence in the control of foreign governments by filing more than a dozen MLAT requests. The majority of these requests were transmitted prior to the initial indictment filed against the defendant. The remaining MLAT requests were promptly filed as soon as the government became aware of the existence of evidence in other foreign jurisdictions, some of which did not become apparent until the government received evidence in response to its initial requests for foreign assistance. In every instance, the government has used every available channel to expedite the processing of these requests for foreign evidence. Indeed, prosecutors have personally traveled abroad to entreat our foreign counterparts to expedite MLAT requests. Even Congress has expressly recognized the inherent difficulty and time-consuming nature of obtaining foreign evidence through MLAT or letter rogatory requests, as evidenced by 18 U.S.C. § 3292, which provides for the tolling of the statute of limitations based on the government's filing of an official request for foreign assistance. See also United States v. Roshko, 969 F.2d 9 (2d Cir. 1992); United States v. Baron, 1994 WL 63251 (S.D.N.Y. Feb. 18, 1994). In sum, the government's good-faith efforts to comply with all of its discovery obligations, coupled with the legally-recognized challenges and delays implicit in foreign requests for evidence strongly counsel against the extraordinary remedy sought by the defendant.

      Rule 2 instructs that the Rules of Criminal Procedure "are to be interpreted to provide for "fairness in administration" and "the just determination of every criminal proceeding." Rather than attempting to "assure the proper and orderly administration of criminal justice," Jackson, 508 F.2d at 1007, "fairness in administration" and "the just determination" of this case, the defendant seeks to use the sprawling nature of his vast international criminal

---

such materials when the government complies with those demands. (Def. Reply at 4).

organization to short-circuit the government's ability to prosecute and disrupt the transnational trafficking of dangerous narcotics by imposing an ad-hoc discovery mandate that circumvents the carefully structured provisions of Rules 16(a) and 16(c). To ensure the fair administration of justice and preserve the integrity of Congress' meticulously-crafted rules for discovery in criminal matters, the defendant's request must be denied.

If there is difficulty receiving discovery materials, as Gatto wisely concluded, the appropriate remedy may be an adjournment of the trial date in this matter pursuant to 18 U.S.C. § 3161(h)(8), which authorizes a continuance of the date on which a criminal trial will commence in cases that are "so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by [the Speedy Trial Act]". As the defendant has acknowledged, the "unique" circumstances of this case include "a particularly large volume of evidence . . . including hundreds of hours of foreign wiretap recordings" (Def. Mem. at 16-17), "tens of thousands of pages of document discovery" (Def. Mem. at 2), an appreciable amount of "materials in languages other than English" and "the scope of the charges in the Superseding Indictment, which spans more than seventeen years" (Def. Mem. at 17). Moreover, the defendant also "appreciates that in this case the government's discovery process is complicated by the fact that the evidence is largely maintained in foreign languages - either written in foreign languages or overheard in audio recordings of intercepted conversations" (Def. Mem. at 13) and appears to agree with the government's own assessment that it takes "literally hundreds of hours to sort and organize this material" without even accounting for "the time needed to prepare

translations." (Def. Reply at 4).

Given the undeniable complexities of this case, which even the defendant acknowledges to be "unique," an adjournment of the trial date in order to allow the government to complete its receipt of evidence from foreign governments, translate these materials, and provide them to the defendant in an expeditious and organized manner that will permit him to adequately prepare for both pretrial motions and trial is a reasonable request "to assure the proper and orderly administration of criminal justice." Jackson, 508 F.2d at 1007.  Less than five months have elapsed since the defendant's initial appearance in this district, and the government filed a superseding indictment just eight days ago.  The trial in this multi-defendant case spanning more than seventeen years of narcotics trafficking and money laundering offenses is currently scheduled to commence approximately eleven months after the defendant's arraignment.  In cases involving similarly complex criminal prosecutions, courts in this Circuit have routinely scheduled appreciably longer periods of time for trial preparation and pretrial motion practice, even where the defendant is incarcerated. See United States v. Williams, 372 F.3d 96 (2d Cir. 2004) (finding that delay of nearly three years from defendant's indictment to the commencement of his trial did not violate his Sixth Amendment right to a speedy trial); United States v. Vasquez, 918 F.2d 329 (2d Cir. 1990) (holding that twenty-six month delay between defendants' arrest and trial did not violate their constitutional speedy trial rights and pretrial incarceration was not sufficient prejudice to defendants to outweigh other factors); United States v. Lane, 561 F.2d 1075 (2d Cir. 1977) (trial commenced approximately fifty eight months after indictment); United States v. Cyphers, 556 F.2d 630 (2d Cir. 1977) (no violation despite a delay of thirty three months between arrest and trial and government did not indicate it

was ready for trial until twenty months after defendant's arrest); United States v. Infanti, 474 F.2d 522 (2d Cir. 1973) (no violation despite a delay of twenty eight months); United States v. Fasanaro, 471 F.2d 717 (2d Cir. 1973) (no violation despite a delay of over four years necessitated by the inability to locate a chief government witness); United States v. Saglimbene, 471 F.2d 16, 17 (2d Cir. 1972) (no violation despite a delay of six years between indictment and trial); United States v. Schwartz, 464 F.2d 499 (2d Cir.) (no violation despite a delay of four and a half years); see also Barker v. Wingo, 407 U.S. 514, 533 (1972) (no speedy-trial violation despite a delay of "well over five years").

United States v. Infanti, 474 F.2d 522 (2d Cir. 1973) is particularly instructive. In that case, the Second Circuit held that a delay of twenty eight months from arrest to trial was not unreasonable because of the "complex nature of the case" and the fact that witnesses included "not only a police inspector and a securities representative from Frankfurt but a hotel manager from London." Id. at 527-28. See also, e.g., United States v. Gambino, 784 F. Supp. 129, 141 (S.D.N.Y. 1992) (holding that the defendants' Sixth Amendment right to speedy trial was not violated by four-year delay between indictment and scheduled trial date where the delay was caused, in part, by the "complexity of this multidefendant case, in which a conspiracy lasting approximately 15 years is charged" and in which there was "extensive pretrial motion practice").

In fact, a review of the dockets of several currently-pending cases (all involving defendants held under pretrial confinement) demonstrates that judges in this district recognize the need to scheduled appreciably longer periods of time for trial preparation and pretrial motion practice in complex criminal prosecutions than the eleven months provided for in the Court's

14

initial scheduling order.[5] See, e.g., United States v. Velasquez, Cr. Docket No. 05-835 (Johnson) (trial date scheduled nearly three years after indictment and more than eighteen months after defendant's arraignment on narcotics trafficking charges due to the complexity of the case, including foreign wiretaps and the fact that the defendant was extradited from Colombia); United States v. Shaheed Khan, Cr. Docket No. 06-255 (Irizarry) (trial on CCE and other narcotics-related charges scheduled twenty-eight months after initial arraignment due to the complexity of the case and pretrial proceedings); United States v Sarachandran et al., Cr. Docket No. 06-615 (Dearie) (setting trial date more than two years after arrest in complex multi-defendant case involving charges of providing material support to terrorists); United States v. Pratheepan, et al., Cr. Docket No. 06-616 (Dearie) (same); United States v. Alejandro Guzman, Cr. Docket No. 06-654 (Townes) (trial date set more than two years after defendant's arrest in complex narcotics-trafficking case); United States v. Anselmo Gomez, Cr. Docket No. 07-519 (Townes) (trial in narcotics conspiracy case scheduled eighteen months after defendant's arrest); United States v. Martin Aguilar and Gilberto Caraballo, Cr. Docket No. 01-1367 (Dearie) (more than five years of pretrial detention before defendants were brought to trial on murder charges).[6]

---

[5] At the initial status conference in this matter, the government did not object to the Court's scheduling order providing for a January 12, 2009 trial date. Despite greater than expected delays in the receipt of foreign evidence requested through MLATs, and the recent superseding indictment adding two defendants and several additional charges, the government continues to believe that it will be in a position to try the case on January 12, 2009. The government will not, however, be in a position to comply with the defendant's unreasonable demand for the production of all evidence, including translated copies of evidence that is still in the custody and control of foreign governments by August 1, 2008.

[6] This list is not meant to be exhaustive; it is presented merely as a guide to the Court regarding reasonable trial schedules that have been imposed by judges in this district in complex cases similar to the one at issue here.

II.  **DEFENDANT'S RELEASE FROM CUSTODY IS NOT NECESSARY FOR THE PREPARATION OF HIS DEFENSE SINCE THE MDC HAS AGREED TO PROVIDE THE DEFENDANT WITH REASONABLE ACCOMMODATIONS FOR THE STORAGE AND REVIEW OF DISCOVERY MATERIALS**

In reply to the government's memorandum of law, the defendant claims that the government "has offered no assistance and provided no meaningful alternatives" to ensure the defendant's ability to meaningfully review evidence and prepare his defense. (Def. Reply at 9). In fact, as demonstrated by the attached letter from legal counsel to the MDC, the government and the MDC have offered to make reasonable accommodations that will afford the defendant with every opportunity to access discovery and prepare his defense. (See Exhibit 3)

At the defendant's request, the MDC was prepared to transfer the defendant to the West Building in early May. Because the West Building is comprised of two-person cells rather than dormitory housing, such a transfer would alleviate many of the defendant's concerns regarding the ability to secure his private discovery materials. This transfer was delayed in order to accommodate the defendant's request for special visitation privileges with his two-year old son, which the Court granted on May 13, 2008. According to MDC legal counsel, the defendant will shortly be transferred to the West Building in accordance with his petition. In addition to providing the additional privacy that the defendant seeks, this transfer will also provide greater storage capacity for the defendant's discovery material. While the MDC is incapable of providing secure storage capacity for the entirety of the discovery produced in this case, it does have the capacity to provide a secure storage facility for up to ten boxes of the defendant's discovery materials at a time. There is no practical reason why the defendant would need

simultaneous access to all forty boxes of the government's discovery, as it would be impossible to review such a volume of materials in any one sitting. Defense counsel can rotate the boxes of discovery accessible to the defendant and thereby provide the defendant with complete access to all of the produced discovery in a manner that is more than sufficient for the defendant to review the materials and assist in the preparation of his defense. Moreover, as suggested by MDC legal counsel, defense counsel can scan the paper documents onto compact discs capable of being reviewed by computer.

The MDC has also informed the defendant how he can obtain greater access to computer facilities, in order to review the many audio recordings and other evidence provided by the government on compact discs. In particular, the defendant can obtain access to visiting room computers for several hours a day from Monday to Friday if he submits the proper forms and demonstrates the need to review an excessive amount of electronic discovery (which is certainly present in this case); can sign up for six hours of weekly computer access as part of the regularly-scheduled law library hours for each floor of the housing unit; and can request an additional six hours of computer access on Fridays with a demonstrated legal need such as excessive CD-ROM discovery materials or an imminent court deadline. However, he has not yet made such a request.

In short, the government and the MDC propose to provide the defendant with: (i) unlimited access to up to ten boxes of discovery at a time, which can be rotated by defense counsel when the defendant has completed his review of each set of boxes; (ii) transfer to a more private cell with greater ability to secure the defendant's discovery materials; (iii) a secure space within which to store up to ten boxes of materials; and (iv) access to computers for the review of

17

electronic discovery up to seventeen hours per week if the defendant takes advantage of all of the available opportunities to sign up for computer time. In addition, the MDC has always provided the defendant with the opportunity to consult with defense counsel on a regular basis to discuss the case and/or review evidentiary materials.

In light of the MDC's willingness to provide the defendant with reasonable accommodations to assist in the preparation of his defense, it cannot be argued that release of the defendant from custody is "necessary" such that the Court should invoke the rarely-used provisions of 18 U.S.C. § 3142(i) to order the release of a non-bailable defendant to the custody of his attorneys under the purported supervision of private security guards paid for by the defendant.[7] While this is not a motion for bail pursuant to § 3142(g), it is entirely appropriate for the Court to consider all of the many factors that render the defendant unamenable to pretrial release in determining whether to exercise its discretion under § 3142(i), which, by its very

---

[7] The government reiterates its position that private security guards on the defendant's payroll are not the "appropriate person[s]" contemplated by Congress when it enacted 18 U.S.C. § 3142(i). Moreover, any transfer of the defendant out of the custody of the U.S. Marshals and into the "custody" of a third party would trigger the operation of the Immigration detainer that has been lodged against the defendant, which specifically requires the U.S. Marshals and Bureau of Prisons to retain custody of the defendant for a period of 48 hours, despite any order of release, so that the defendant can be brought into the custody of Immigration and Customs Enforcement and placed into removal proceedings. If the defendant is transferred to the custody of private security guards, then he is most certainly not "continu[ing] to remain in the custody of the Bureau of Prisons" both as a practical and legal matter. (Def. Reply at 11). To the extent that the defendant "would consent to his transport by the Marshals and agree to compensate that agency for the costs of his transportation," (Id.), the defendant seeks to impose an enormous burden on the Eastern District Marshals Service, who are already sorely understaffed and hard-pressed to continue to perform their required duties with respect to the transportation of prisoners and pretrial detainees for court appointments. To require the Marshals Service to undertake the additional burden of providing daily transportation and around-the-clock supervision of a defendant more than 200 days prior to the scheduled trial date is unreasonable, unprecedented and entirely unnecessary since the MDC has already agreed to remedy the circumstances prompting the defendant's request for temporary release.

nature, was contemplated as a last resort option where no other accommodations could be made to ensure the defendant's constitutional protections. This is particularly true given the defendant's failure to pursue any administrative remedies and the availability of multiple reasonable alternatives to release that the MDC has already agreed to provide.

## CONCLUSION

For all of the reasons set forth above and in its initial memorandum of law, the government respectfully requests that the Court deny the defendant's motion in its entirety.

DATED: Brooklyn, New York
June 26, 2008

Respectfully Submitted,

BENTON J. CAMPBELL
United States Attorney
Eastern District of New York

By: /s/
STEVEN L. TISCIONE
TONI M. MELE
LICHA M. NYIENDO
ALEXANDER A. SOLOMON
Assistant United States Attorneys
(718) 254-6317/6138/6350/6074